**Volume 1**

**Pages 1 – 23**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**BEFORE THE HONORABLE EDWARD M. CHEN**

WISTRON CORPORATION, ET AL.,            )
                                        )
          Plaintiff,                    )
                                        )
  VS.                                   ) NO. C 10–4458 EMC
                                        )
PHILLIP M. ADAMS & ASSOCIATES,          )
LLC, ET AL.,                            )
                                        )  San Francisco, California
          Defendants.                   )  Wednesday
                                        )  April 6, 2011
_____)  11:38 a.m.

**TRANSCRIPT OF PROCEEDINGS**

APPEARANCES:

For Plaintiffs Wistron and AOpen:
                    K&L GATES
                    Four Embarcadero Center
                    Suite 1200
                    San Francisco, California  94111
               BY:  HAROLD H. DAVIS, JR., ESQ.
                    AND
                    K&L GATES
                    630 Hansen Way
                    Palo Alto, California  94304
               BY:  JEFFREY M. RATINOFF. ESQ.


For Defendants:     QUINN DUMKE
                    2150 S. 1300 E.
                    Suite 500
                    Salt Lake City, Utah  84105
               BY:  EZEKIEL R. DUMKE, IV, ESQ.



Reported by:        BELLE BALL, CSR #8785, RMR, CRR
                    Official Reporter, U.S. District Court

Belle Ball, CSR #8785, RMR, CRR
Official Reporter – U.S. District Court
(415) 373–2529

**WEDNESDAY, APRIL 6, 2011**                                        **11:38 A.M.**

<u>**P R O C E E D I N G S**</u>

         **THE CLERK:**  Calling Case C 10-4458, Wistron versus Phillip Adams.

         Counsel, please come to the podium and state your appearances for the Record.

         **MR. DAVIS:**  Good morning, Your Honor.  Harold Davis, K&L Gates, for the Wistron and AOpen Plaintiffs in this case.

         **THE COURT:**  All right.  Thank you, Mr. Davis.

         **MR. RATINOFF:**  And Jeffrey Ratinoff for the Plaintiffs as well.

         **THE COURT:**  Good morning, Mr. Ratinoff.

         **MR. DUMKE:**  Good morning, Your Honor.  Ezekiel Dumke, Quinn Dumke, for the Defendants.

         **THE COURT:**  All right.  Okay.  In light of -- let me first address the question of the first-to-file rule, appropriate venue, transfer or not.

         In light of what's happened in the Wyoming district courts, dismissal for lack of jurisdiction, and now there's apparently some dispute as to whether the appeal is proper, and what venue it should be in, doesn't that moot out -- I mean, how could I -- even if I were to find an exception under *Genentech*, how could I possibly transfer this case, or find -- or defer to an action in which it no longer exists, as we sit here right now?

**MR. DUMKE:**  Well, at this point, Your Honor, I don't believe that a transfer would be possible.  Although we had not pled a stay, we would -- we would ask that to be considered as an option, in light of the ongoing appeal.

**THE COURT:**  Okay.  Well, let's talk about whether this case belongs here.  And then, the personal jurisdiction, to me, that's kind of the more interesting question.

Before we go down that road, I mean, I will say that there's pretty good argument on both sides here, but if I were to find there were no personal jurisdiction over your clients here in California, and given the fact that it sounds like Wyoming's not a viable place, what are you going to do?

Would you just come back here and file an affirmative suit here?  Or what would you do?

**MR. DUMKE:**  One of the Defendants in this action continues to have a case in Utah, and continues to do business in Utah.  So it's likely that the case would then be filed in Utah if the Wyoming court finds that it's -- that the Plaintiffs aren't subject to jurisdiction.

**THE COURT:**  What is the Utah action?

**MR. DUMKE:**  It's *Phillip M. Adams & Associates* -- it was against Sony.  I -- I can work to provide the Court with --

**THE COURT:**  Which of the Defendants you said -- or which of the Plaintiffs here -- are you saying --

**MR. DUMKE:**  No, I'm saying that Phillip M. Adams &

Associates and Dr. Adams have been litigating in Utah.

**THE COURT:** Oh, against another defendant.

**MR. DUMKE:** Against another -- yes.

**THE COURT:** Right. But, you may come up against the same issue. And that is, if there's no personal jurisdiction in Wyoming over Wistron, why would there be personal jurisdiction in Utah?

I'm just trying to get practical here. If you really want to vindicate, why not, to get this on the road, frankly, stipulate and file an affirmative complaint here, and -- because you know there's jurisdiction here.

**MR. DUMKE:** Certainly, Your Honor.

**THE COURT:** Maybe in Texas -- I don't know, somebody's in Texas, right? Yeah, some are in Texas. One or the other.

I mean, why not -- why not -- instead of all these skirmishes over jurisdiction, venue, Form 9, just litigate the case?

**MR. DUMKE:** Well, Your Honor, we feel that we have the correct jurisdiction in Wyoming, and we would like to move forward with that.

Should the Court find that we are subject to jurisdiction in California, then certainly we will be litigating in California.

**THE COURT:** All right. Well, I was just trying to

short-cut that, and see whether there was some way to --

**MR. DUMKE:**  I know; I'm sorry.

**THE COURT:**  I see you're not quite willing to do that.

Well, let me ask -- you know, there's a lot of stuff on the personal jurisdiction argument that you cite about various activities.  Taking depositions here in connection with the Utah case, having been involved in a qui tam action here, coming and meeting with HP, and getting a license.

But, this is not a case where you are asserting general jurisdiction, I don't think.  And if you are, I don't think that is going to fly, because as much as that is, that's not the kind of systemic, pervasive presence that is equivalent of residency.  So, you need specific jurisdiction.  And if there's specific personal jurisdiction, this case, this action, has to arise out of California contacts.

And so, a lot of California contacts you have cited, I have trouble seeing how they're causally related to this.  And the best argument is that they've sued in -- somewhere else, companies doing business here, including these, your clients.  And, you know, I don't know.

Is that enough?  Is that enough sort of contact with a state?  When you sue a California resident, let's say in another state, but a California resident nonetheless, does that open the person in that suit to permanent jurisdiction in the

state of the -- the residence of the defendant?

**MR. DAVIS:**  Well, certainly I like to think so, but I think -- but I think the -- at least our better argument on this issue is that there are other activities as defined under the *Avocent* line of cases and *Autogenomics*, which was cited by the Defendants, which says that there is a relation to the California cases.

And this is an admission by the Defendants.  And, that is the admission that they are compelled by a license agreement with HP that they have to enforce these patents.  And that's a continuing enforcement obligation that was rendered in California, with a California licensee.

**THE COURT:**  What is the evidence -- I don't have all the papers.  I don't have all the exhibits.  Show me -- you've said that --

**MR. DAVIS:**  It's at Paragraph 5 on Page 1 of their opening brief.  And the actual quote is (As read):

"In May of 2005, in compliance with the terms of license agreements for Dr. Adams Technology, PMA" -- Phillip M. Adams Associates -- "was forced to file suit against numerous companies in the computer industry."

And we have asserted that that is in relation to their earlier HP license agreement.  In their reply brief,

there was no denial of that. There hasn't ever been a denial that the HP license agreement is the one that forces them to bring continuing lawsuits against alleged infringers.

And, they have, in fact, done so. They filed another suit in Utah to some of the suppliers to my clients, including *Winbond* and *ASUSTek*, and others.

And so, having filed a lawsuit against our suppliers for some of our component products, and then threatened lawsuits on those identical patents, and told us that it was because they were obligated out of their license agreements with the California licensee, we feel that that's an other activity related to enforcement that's required under the *Akro* line of cases that says that's enough in conjunction with the cease-and-desist letters to confer personal jurisdiction -- specific jurisdiction here in California.

**THE COURT:** So the argument is that the contact is the licensing engagement with HP in this state, which then gives rise to the dispute here --

**MR. DAVIS:** Right, it's a continuing obligation because -- and it's from what is an admission by the Defendants, which they say, "We're under a continuing obligation, we have to" -- in order to comply with the terms of the license agreement, they have to file lawsuits. That's a continuing obligation. And we believe that's with HP.

Now, Your Honor, I have to confess, I haven't seen

the HP agreement.  We haven't had discovery in this case.  So we haven't seen that agreement.  But, I can tell you that the indications from the record of what we have presented indicate that that's a continuing obligation in California.

And, there's two ways that I think we know that.  The first is the qui tam action.  They -- Dr. Adams filed a qui tam action that relates to the technology that's at issue here.  Dr. Adams claims to have discovered a fixed disk error that occurs in floppy disk components.  And then, his patented solutions are ways to solve that error.

He filed a qui tam action under the false-claim act against HP and Toshiba and other computer companies, claiming that they were basically in violation of the false-claim act for providing computers that had that error, and not disclosing them.

He litigated that case in California for four years.  And in fact, later filed a lawsuit, albeit in Utah, but he filed in -- against the California Attorney General, alleging that California actors were interfering with his right to do business and contract with HP to enter a license agreement so that it could then go out and sue other people.

**THE COURT:**  So, this is different from the qui tam action?

**MR. DAVIS:**  That's right.  It's a separate action.

**THE COURT:**  What action is this?  Say it again.

**MR. DAVIS:**  It was one that was filed in Utah.  And I believe it was filed in 2001.  It's at Exhibit 52 in the Ratinoff declaration.  We submitted that into evidence.

**THE COURT:**  And that was against the State of California?

**MR. DAVIS:**  The Attorney General, yes, Your Honor.

**THE COURT:**  Attorney General.

**MR. DAVIS:**  Yes, sir.

**THE COURT:**  For interference?

**MR. DAVIS:**  That's right Your Honor.

**THE COURT:**  For what -- what's the rationale?

**MR. DAVIS:**  The rationale was that the Attorney General had apparently -- there was an ongoing, continuing lawsuit between the Attorney General -- because the Attorney General took the place of the relator in that case, to take over the false claims action.

And, Dr. Adams then went to HP, one of the defendants in that case, and said "Well, I will license to you my solution to this error, and thus you won't be liable going forward for any of these problems."

The Attorney General filed a TRO in California to prevent that license.  That license agreement.  And that was at least the factual basis for him suing in Utah, to argue that there was interference with his right of contract.

**THE COURT:**  All right.  But that's getting far

afield.  I don't see how this case arises out of that.

**MR. DAVIS:**  I agree, Your Honor, it doesn't arise out of the Utah action.  But, but I was using that -- those two cases as evidence that it is the HP license and his continuing obligations with HP that has caused him.  And that's what relates here.

**THE COURT:**  Let me ask you, Mr. Dumke.  Is there a dispute that the HP license requires you to bring suit to enforce the patent?

**MR. DUMKE:**  As I recall, I believe the wording of the -- of the agreement with HP is that -- "making a good-faith effort to enforce the licensed technology."

**THE COURT:**  So your Paragraph 5 in your --

**MR. DUMKE:**  Is in reference to that.

**THE COURT:**  To that.

**MR. DUMKE:**  Yes.  That's correct.

**THE COURT:**  What is your response?  At least, you know, that's a hook where there's California-based activity.

And if, for instance, there had been a dispute over the licensing with HP, and it claimed that, you know, somehow you breached -- your client breached the contract or something, and they sued Dr. Adams, chances are I would think that there would be jurisdiction in California in an HP versus Adams suit.  In all likelihood, in most -- if you --

**MR. DUMKE:**  Your Honor, I think, I think relation in

time is the greatest aid to my client.  With the HP agreement done in some time in 2001, the enforcement is amorphous.  And so, to the extent that the suit was brought in furtherance of the HP suit, I would say that it was only to hedge our bets against an HP -- any potential claim by HP.

**THE COURT:**  But nonetheless, it's a causal relationship.

**MR. DUMKE:**  I believe so.

**THE COURT:**  Even though it's timely, the agreement is in play and it's in place.

**MR. DUMKE:**  The agreement was entered in 2001, and nothing has been entered into to alter that agreement.

**THE COURT:**  All right.  It hasn't been terminated, in other words.

**MR. DUMKE:**  Yes.

**THE COURT:**  And that's your best argument for doing business or having contact in California?

**MR. DAVIS:**  There are others, Your Honor.  I mean, I think that's -- I would agree with you that that's our best.

The other is that they have asserted in their cease-and-desist letters two patents that they ended up selling to Sony.  Now, ultimately, we've taken the position that we understand that they're no longer owned by Mr. Adams.  But, Mr. Adams did assert them in the cease-and-desist letter as if they were his own, which is why we initially filed our

complaint adding those two patents.  We subsequently learned that Mr. Adams has sold those patents to Sony, which is based in San Diego, here in California.

So to the extent we filed that initial action based on those patents, it relates to patents that they transacted business with.  It's similar in our position to what an exclusive license is.

If you remember, the case law that's cited in the briefs, both the *Avocent* case, the *Akro* case, and one that I don't believe was cited, which is the *Breckenridge* case, another Federal Circuit case in 2006, all those cases hold that in addition to sending a warning letter, if you have an exclusive license within the jurisdiction or some other continuing obligation in the jurisdiction, that's sufficient to confer specific personal jurisdiction.

And our position would be not only do they have that continuing obligation under their HP agreement to enforce the patent rights, but also under the *Sony* case, they have asserted a patent, we don't know the necessary relationship between Sony and Phillip M. Adams, but they sent a cease-and-desist letter that we were infringing those patents, and those are in the record.

And then they said, well, Sony owns those patents, and that was subject to a sale to Sony in California.  So that certainly relates to some of the patents that are at issue.  I

mean, right now, those patents are here, and pled in this case.

**THE COURT:** Well, ironically, are you intending to keep those --

**MR. DAVIS:** Assuming that -- assuming that Dr. Adams is not going to file counterclaims on them, and Sony's not, then no, we would not keep those in this case.

**THE COURT:** So the jurisdictional anchor is sort of hanging by a thread.

**MR. DAVIS:** At least for that -- that second argument.  It certainly arose, but that -- even beyond that portion, it still is evidence of the extra-judicial or -- excuse me, not extra-judicial, but the -- the other activities that Mr. Adams has conducted here in -- in the state, that arises out of the this -- or at least is a causal connection to bringing this action.

You know, there are other -- a lot of other factors, like you've said, that we've cited.  I mean, he sold other patents, he's traveled here regularly, he's conducted --

**THE COURT:** Let me go to the fairness for the due-process catchall prong, have to find that the purposeful availment or -- you know, whatever.

And as I understand that, but the -- the critical question is whether there were minimum contacts with the state out of which this case arose or is related to.  And you've made the argument, and I understood that.

What I didn't understand was exactly how it was compelled, but, sounds like there's not a lot of dispute that there was an HP contract, and that Paragraph 5 does reference an obligation to enforce the license.  And that may have given rise to -- some of the lawsuits.

**MR. DUMKE:**  And Your Honor, I would like to just kind of point out that you know, it -- it's amorphous as to how vigilant we have to be in that obligation.  But, it is -- it is a reason for the litigation.

**THE COURT:**  Okay.  Well, I appreciate your -- your forthrightness in that.

Let me ask, putting aside personal jurisdiction for a moment, what about the *Twombly/Iqbal* problem here.  You know, it's somewhat ironic.

You have a claim, a threat to sue over unspecified products, so that you don't know exactly what they are, perhaps.  And then you -- you go ahead and bring a declaratory-relief action not identifying the products.

I understand that maybe there's some sort of equity or estoppel argument, or unclean hands.  But nonetheless, how could I entertain -- how could one have a suit without an infringement -- seeking declaratory relief on infringement, without even knowing what the products are?

**MR. DAVIS:**  Your Honor, this is a very interesting question.  I agree with you that this does present sort of a

chicken-and-egg sort of issue here.

That is a mirror image of the motion that we filed in Wyoming against them, alleging that their complaint didn't identify a product. And throughout negotiations, we still don't know what products.

My understanding of what they've alleged here is that, you know, it may be any computer product that we produced that has any sort of media storage device, which we will have some disputes on whether or not that's appropriate.

However, on a declaratory judgment action, I don't think that -- that *Iqbal* and *Twombly*, certainly under the way it's been applied in patent cases, would apply to extend quite to declaratory-judgment actions when we can get some resolution on -- on whether or not we infringe or not.

And what we're asking for, particularly with the local rules here in California, they're going to have to identify an accused product. You know, the patent local rules require them to present preliminary infringement contentions, once you're going to have to identify an accused instrumentality. I think at that point, they clearly know. I don't think that they're under any confusion.

See, it's different in *Iqbal* and *Twombly* when you're a defendant and you're hailed into court because you are alleged that somehow you infringe, and you have no idea how you infringe.

**THE COURT:**  No, I understand.  You're the possessor of the information, and the nominal defendant in this case ought to know.

**MR. DAVIS:**  Right.

**THE COURT:**  Are there any cases, are there any post-*Iqbal* cases that say, "Well, excepted from the usual rule is where the Defendant knows any way"?

**MR. DAVIS:**  Right.  You know, Your Honor, we researched that issue, and we couldn't find a case that was directly on point on this issue.

You know, the way that we look at it is that the Plaintiff, the patentee here, having accused us of infringement, has some idea of what products -- at least one product that infringes.

I mean, they filed under Rule 11 in Wyoming that we infringed these patents.  So, you know, they made a Rule 11 certification that there was a good-faith basis that one of our products infringed.  So, they should already have that information.

**THE COURT:**  Let me ask you, Mr. Dumke, since your client initiated this with an initial letter, do you agree that it's unreasonable to apply the strict letter of *Iqbal* here, to the nominal Plaintiff who otherwise would have been the substantive Defendant in the case?

**MR. DUMKE:**  No, Your Honor, because I feel that in

the letter and in our Wyoming action, we -- you know, which had been filed prior to the amended complaint, we specify how there would be infringement.

And, we feel that that was more than enough information for the Plaintiffs in this case to look to their product line, and acknowledge the allegations that we made, and how they apply to their --

THE COURT:  Well, but you would know -- don't you have some duty to identify which products?  What are the accused products?

I mean, certainly in this court, you would have to -- even if you had brought the affirmative case, you would have to have a chart, an infringement contention chart which shows which devices, you know.

So, why isn't it fair to sort of put it back on you at some point in this litigation, say, "All right, which products are you talking about?"

MR. DUMKE:  I feel at some point in this litigation it would be fair, but I feel at this stage that it's necessary for the Plaintiffs to articulate what products they are seeking relief for.

THE COURT:  Okay.  What about the invalidity claims?  Now, there, you do have more information.  Are there cases that say that the usual formulaic patent counterclaim that simply recites conclusorily the basis for -- statutory bases for

invalidity are sufficient?

What do the post-*Iqbal/Twombly* cases say?

**MR. DAVIS:** Sure. There aren't any in this jurisdiction that we could find that were terribly helpful for our position. However, we do cite three of out-of-jurisdiction cases. And they say that just alleging the statutory basis for invalidity is sufficient.

And, probably most persuasive is under Eastern District of Texas case law -- and as a person that defends patent companies' cases, it's somewhat hard for me to talk about this, but I think that they are right in this point, and that is that the Eastern District of the Texas has very similar local rules.

And under the *Teirstein* case, I believe that was a Judge Davis case, but Judge Davis there indicated that, you know, filing a counterclaim of invalidity and just specifying the statutory basis would be sufficient under Rule 8. And that's a post-*Iqbal* case.

So, there are some -- and then we also cite the *Pfizer* and the *Elan Pharma* cases, which indicate that, you know, just providing a statutory basis is sufficient. You don't have to actually identify a specific reference, or how that --

**THE COURT:** What about Defendants' citation to *Qarbon versus eHelp,* a 2004 Northern District case? Is that a patent

case?

MR. DUMKE:  Page 11 of our reply.

THE COURT:  Page 11 of the reply brief.

MR. DAVIS:  Just one moment, Your Honor.

THE COURT:  While you are looking at that, let me ask you, Mr. Dumke, is that a patent case?

MR. DUMKE:  It is a patent case, Your Honor.

THE COURT:  And it involved invalidity?

MR. DUMKE:  It involves a declaratory judgment action.

THE COURT:  And did the Court address invalidity contentions, as opposed to infringement contentions?

MR. DUMKE:  Hmm.

THE COURT:  You don't remember?

MR. DUMKE:  I don't recall right now.

THE COURT:  I will have to look at that.

MR. DUMKE:  I can't pull it up.

THE COURT:  Okay.  Well --

MR. DAVIS:  Your Honor, I have to confess, I'm not exactly sure if that case dealt with -- with statutory basis for invalidity claims.  You know, I don't believe it does.

And also, I don't think that it would be correct, given the patent local rules here, to require us at the initial pleading stage to describe our invalidity basis by identifying a piece of prior art, which sort of, in my mind, is not the

purposes of the local rules requiring premium invalidity contentions at a time set forth in the local rules.

We are certainly giving them a basis to why we think it's invalid, and that is that we think it's anticipated, that it's -- that it's obvious, and that there hasn't -- there's a lack of written description under Section 112.

THE COURT:  Part of your response again is that in light of the local rules, this would be fleshed out fairly quickly, and we ought to create a Northern District exception to *Twombley* and *Iqbal*.

MR. DAVIS:  Well, I don't know if it's an exception, Your Honor.  I mean, *Iqbal* and *Twombly*, after all, didn't really deal with the patent area.

And, there's certainly a lot of cases, and this is an unresolved area of the law, whether or not you really have to even specify the limitations when you assert a specific product, whether or not you have to show how that product meets the limitation on claims.  And, that's an unsettled area in patent law.

THE COURT:  The Federal Circuit has not addressed this question?

MR. DAVIS:  No.  It has not addressed that particular question at all.

MR. DUMKE:  Your Honor, *Qarbon*, or however it's pronounced, does address invalidity as well, as part of the

declaratory judgment action.

THE COURT: All right. Well, I will look at that. I think -- and I know we have a case management conference scheduled, but I think it makes sense, I need to resolve these questions. And, what I think we should do is as soon as I get out an order one way or the other, if the case stays here, I would set down a case management conference meeting.

I do appreciate the comprehensive case management statement that you all provided. But, it doesn't make sense to start setting dates until we make sure where we're at. I understand there's a motion for the case which I've been deferring until we also figure out what happens here.

MR. DUMKE: That's right.

MR. DAVIS: And Your Honor, I think, as with the case management conference statement, I don't think there's really any disputes that we have. I mean, we were pretty much in agreement on everything in that statement.

THE COURT: Yeah. I was glad to see that. I think there was one question I had, though, while we're here. And maybe this is a typo. And --

MR. DAVIS: Yeah. The only issue that we did want to raise on that issue, Your Honor, is we talked about is there any variation from the patent local rules. And one that we did not mention in our case management statement that I had a chance to speak with opposing counsel about earlier is that --

the ten-term-rule limit.

THE COURT:  Yeah?

MR. DAVIS:  Right now we have 150 claims that have been asserted against us.  Counsel has represented to us -- and I believe him -- that those will be pared down substantially.  However, if we're still talking about several dozen claims, we may need to seek relief to get more than ten terms.

We're obviously very cognizant of the Court's time and effort that goes into these claim construction terms.  And we would do our best to -- and I think we've worked well together resolving these types of disputes, and get it down to ten or as close to ten.  But if we're still talking, you know, five dozen or six dozen asserted claims, we may need a little bit of relief from that.

THE COURT:  Well, you certainly can ask.

(Laughter)

THE COURT:  The question I had, and I have this, this is on Page 13, regarding documents and ESI, it says (As read):

"The parties agree that no voicemails, instant message or cell phone text messages will be preserved, searched, or produced."

I just want to make sure that you are all agreeing that that's -- you're only talking about e-mails that you're interested in -- you know.  Okay.

MR. DAVIS:  For the most part --

**THE COURT:** I didn't want to have any misunderstanding.

**MR. DAVIS:** No.

**MR. DUMKE:** I believe, Your Honor, that with the basis for this infringement arising from so long ago, we don't want to add any additional hurdles.

**THE COURT:** All right. Good. I'm glad.

**MR. DAVIS:** All right.

**THE COURT:** Interesting question. Let me look at this, and see where we go. I'll get out an order as soon as I can.

**MR. DAVIS:** All right. Thank you, Your Honor.

**MR. DUMKE:** Thank you, Your Honor.

**THE COURT:** Appreciate it. Thank you very much.

(Proceedings concluded)

## CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 10-4458 EMC, Wistron, et al. v. Phillip M. Adams &  Assoc., Inc., et al., were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


_____/s/  Belle Ball_____

Belle Ball, CSR 8785, RMR, CRR

Friday, August 5, 2011